15 minutes for plaintiff, 15 minutes to be shared by the defendants. Mr. Koenig for the appellants. Thank you, your honors, and I would appreciate being able to reserve five minutes of rebuttal time. You may, please proceed. Please the court, last year in the case of Webb v. United States, this court held that a reasonable jury could conclude that by merely misdating and the recording, by merely misdating the recording of a conversation that took place between Webb and Gerald Bray in a DEA 6 report, that detective Metcalf aided in the prosecution of Webb by influencing Lucas to testify falsely before the grand jury and by influencing the prosecutor to bring charges. In this particular case at Barr, the defendants Metcalf, Mayer, and Faith all participated in producing false reports more often than in the case of Webb. Many more instances are set forth in our brief of acts that were committed by those defendants that aided and abetted in the indictment and prosecution of the appellants in this case. In Webb, the court also concluded that Faith and Metcalf made false statements that were used to establish and strengthen probable cause to prosecute Ron Davis. Ron Davis, this court might recall, was a person who was framed by Bray as the person selling drugs that Geneva Frecker, an appellant in this case, supposedly delivered. And lastly, in Webb, this court found that the trial court abused its discretion by not allowing, not permitting additional discovery on the issue of qualified immunity. All those issues that were decided in Webb are similar to what was decided in, are similar to those cases, to those issues in this case. Was it the same trial judge? It is not the same trial judge, Your Honor, and it's not the same plaintiffs, but it is the same defendants for the most part. It is the same fact patterns, the same operation. And was, was Webb decided before or after the trial court in this case ruled? Right, actually I was going to say that next, but Your Honor, Webb was decided late in 2015, and the trial court's decision in this case, ruling summary judgment in 2012, I believe the first decision was in January 2012, and the last I think was in October 2012 or 13, I can't even remember the dates anymore, but well before the Webb decision. Yet we still have to look at what they did in this particular case. Correct, Your Honor. Let me stop you about Webb as well. It's pretty well established in this circuit that you have to look at each particular defendant on these questions. Correct. And unless I misunderstand Webb, it didn't look at probable cause with respect to each defendant. It didn't analyze that at all. It really just said that there was a question of fact whether Lucas lied in his grand jury testimony regarding the existence of probable cause. If I'm reading Webb right, how do, I don't understand how that helps you in terms of the, the, the specific allegations that you've made against the non-Lucas defendants. Your Honor, the Webb case establishes the both Webb and the Robertson case, which was also decided last year. Let's just stick with Webb for a minute. Okay, but, but they, but they show that this was a corrupt investigation that took place in, in, in Operation Turnaround. And, and it is found that the defendants in this case engaged in activities that caused falsification of reports that were used to aid and abet in the, in the indictment and prosecution of defendants. Our brief sets forth numerous facts, Your Honor. Yes. I, I, I want to make sure we're not overgeneralizing because it's easy to paint with a broad brush and then everybody is liable. I get that. But that isn't what our role is here. So if I'm right in reading Webb that there, that there isn't any discussion as to attaching liability to individual defendants, they're, they're just all grouped together and then they're connected with Lucas. That's not the way we analyze things. Your Honor, you're right. I think our brief, though, points out specific acts that were committed by each of the defendants in this case showing what their participation was with respect to... I got that. You've, you've, you've told us what you think they did in your brief. All I'm questioning, and I think this is kind of what Judge White was going to too, you start right out basically saying this is Webb. You won in Webb and so therefore you win in this case. And I don't see that. You want to I'm just trying to ask you why this case is governed by Webb. I don't think this case is governed by Webb, Your Honor. I think that the Webb, I think of the fact that the, that the court in Webb came to the conclusions that it did with respect to what the defendants did there is relevant and germane to what happened in this case. The court, the trial court here applied... Is there a holding in Webb as to each defendant or is it dicta? There's a holding in Webb with respect to Faith and Metcalf, Your Honor. Not with respect to the other defendants. On the other hand, we don't know what evidence was before the court with respect to those other defendants in Webb. And Webb is a different case and we're not trying to say that well, Webb controls this case. You raised it, I didn't raise it. So you want us to look more closely at Webb with respect to Metcalf and Faith, right? Yes, Your Honor. Okay, that answers the question. Thank you. Tell us what they did here. Well, in general or specifically? In general, Your Honor, there was... What did each one do that makes them, that removes them from qualified immunity? Well, Your Honor, that's a very good question and it's a very difficult question for us to answer because we were not permitted discovery on qualified immunity except in a very limited manner. We got to take one deposition and that deposition was of the metric captain. We got the discovery out of the Lucas trial, but the Lucas trial is not this trial either and it has different defendants in it. And therefore, what we gathered from the information from the Lucas trial is not necessarily relevant to what the defendants did in this case. We have in our brief, Your Honor, we have lots of examples of, not examples, we have evidence of what the defendants did in this case with respect to both the France prosecution and the Ballard prosecution as well as what they did also with respect to a number of the other suspects in the operation turnaround. If we were permitted to conduct more discovery on that issue of qualified immunity, we would have been able to take the depositions of the defendants in this case. We would have been able to ask questions such as, did anybody report, for example, to Sheriff Sheldon that there was a secret compartment that Bray had in his car where he hid buy money, where he hid drugs, illegal drugs. Was that reported? Did you have knowledge of it and when did you have knowledge of it? We would be able to talk more to the, discover more from the metric people who met with the handlers of Bray and as well as had to be met with Faith and Sheldon in the very beginning of the use of Bray and warn them against the problems with using Bray because the way they were using Bray without any controls, without any procedures in place, without any policies in place, allowed him to be able to fabricate evidence, change things. They lost control over him. Let's loop back for just a second. Yes, sir. As I understand the sequence of things here, and I won't get it all correct, but the summary judgment was filed. As I understand it, you didn't even request to depose Metcalf, Meyer, or Faith until almost a year after you filed your opposition to summary judgment. Your Honor, we, well we asked for the ability. Is that right or wrong? No, it wasn't that we didn't ask to be able to do discovery on them specifically, we asked to do discovery. And at the time, Your Honor, recall that what we have is we have two appellants here trying to take your sweeping generalized statements and narrow it down to what at least I think I need to decide this case. So I'm asking you the specific question of did you wait over a year to read to specifically ask to depose Metcalf, Meyer, or Faith after you filed your I can't answer that question because I was not involved in the case at that point in time. My understanding of what happened was that Judge Nugent stayed discovery in this case almost immediately and only said he was going to provide limited discovery as the case progressed because there was a prosecution of Lee Lucas going on at the time. And that's not even entirely correct either, I don't think. I thought in reading this that he stayed discovery because there was a DOJ investigation ongoing. They were waiting to see what the result of that was. So the question really was, because we're looking at this as an abuse of discretion question, so the question is what did he abuse his discretion in waiting for the result of the DOJ investigation and the Lucas trial? And then the question became did the information that was contained in those two satisfy whatever your particularized need was for additional discovery? And I'm trying to figure out why is that an abuse of discretion? Well because your honor it didn't satisfy our need for additional discovery. The issue of qualified immunity required us to get into understanding more about what these defendants knew, when they knew it, what they did, and what they didn't do when they had that knowledge. And we were prohibited from having that, conducting that discovery. Your honor, all the way through this we thought we were going to be able to obtain discovery and Judge Nugent continued to say that we would have status conferences where we would decide that as we went down. We were surprised when the ruling came down and we weren't provided any further discovery. You weren't involved in the case then? I was not involved in the case at the time, your honor, it's only... Was there a time when the stay of discovery was lifted? The stay of discovery was lifted in a qualified manner. We were provided limited discovery on the issue of qualified immunity and that was never lifted other than for the purposes of providing the discovery from the Lee-Lucas trial. Okay, so but taking Medcalf's death relates to qualified immunity? But we didn't get to take Medcalf's death for qualified immunity. I just think you'd do so much better if you would just answer the questions. Were you, was this, did you ask to take the death and was there a time when you would have been permitted to take the death? No, your honor, the answer to the question, the second question is there was not a time we would have been permitted to take the death. The answer to the first question is I don't believe we asked to take the death of Detective Medcalf specifically. We asked for the ability to do additional discovery. Judge Newton said you can do this much discovery and this much discovery only, figure out who you want to take the depositions of because you only get six depositions and even that was after he'd already ruled on the issue of qualified immunity. So the answer to your first question is we never specifically, we never made a request specifically for the deposition of an individual. We only... Did he limit you in the number of deaths or who you could depose? He, initially with qualified immunity we took the first deposition and he did not permit any further deposition discovery after that and we and we never did get to obtain any more deposition discovery. You said six, you said he could take six. After he ruled on the issue of qualified immunity the defendants filed their motions for summary judgment on the Monell issues and then Detective Medcalf who lost on the issue of qualified immunity filed his motion for summary judgment on the merits. At that point in time we were permitted additional discovery. We were allowed to take six depositions and the six depositions that we took we had to then figure out who were the best to take depositions of in order to be able to establish. Remember we had the Monell claims at that point in time that was all that was left. We took three 30b6 depositions to be able to establish what the policies were of Richland County. We took a deposition of an investigator in the federal case of Lee Lucas for the of authenticating the records in the in this case. We took two other depositions they don't come to mind. None of which however were the depositions of the defendants in this case because the issue of qualified immunity had already been decided. Not for Medcalf. Not for Medcalf. Why wouldn't you have taken his deposition? I'm just curious. The decision as to why to take the depositions that we took your honor was based upon the strategic decisions that were made by the trial council at the time based upon the limited they had six depositions. You used half of them on 30b6 depositions to try to establish municipal liability. Yes your honor. That's a strategic decision. Yes your honor. That was a strategic decision but it was necessary because you exercised your strategy in that way. How does that mean that the limitation to six was an abuse of discretion on Judge Nugent's part? No your honor. That's not the abuse of discretion we're arguing about. We're arguing about the abuse of discretion on the decision on qualified immunity. His decision on qualified immunity had already taken place by that time. So all we were doing is now dealing with a time when you hadn't even asked to we were asking to be able to do discovery. To be able to conduct discovery. We were asking to be able to conduct limited discovery. We didn't ask for the ability to be able to take a deposition of just one person. If you just say I want discovery and you don't say what you want it's kind of hard then to say a limitation is an abuse of discretion. Well your honor we had status conferences during those status conferences. We need to move on. Judge White you have more questions. I do I'm sorry. This thing about the not not considering the affidavit of Bray. What happened with that? That's that's a tough one also your honor. Gerald Bray in in July of 2012 gave gave testimony in the form of a he came clean basically with everything that happened and and coming clean caused him to make contradictory statements to the things that he had done before that were dishonest that were lies and that was a part of testimony that he had provided in the Lee Lucas trial. He came clean three times apparently. We don't know how many times he came clean your honor and we'll never know because unfortunately Gerald Bray has passed away. His estate remains and it remains as a defendant in this case I believe. Actually this case was against Gerald Bray remained pending and and we and we don't understand that because there was never been any determination with respect to our claims against Gerald Bray an agent by the way of the county but but the declaration that he provided in July of 2012 while a contradicted prior testimony that he given in the Lee Lucas case it was it was against his interest as a defendant in this case. It was not an affidavit that a declaration that was submitted for us to be able to defeat a motion for summary judgment. We had not provided any testimony that we were contradicting. This was a testimony of a defendant an opponent in this case. Yeah but I'm sorry who took the declaration? We we got the declaration from from Mr. Bray through his attorney. We met with Mr. Bray at the assistance of his attorney. We met with him and took his declaration. But you did submit it. It's just it wasn't. Yes we yes we submitted it. It wasn't your inconsistent statement. It wasn't our inconsistent statement. We never had an opportunity to cross-examine him during the Lee Lucas trial. We weren't even aware of his testimony at the time that it was being given and and so so the the sham the sham affidavit doctrine just doesn't it's just not applicable in this case. It's it's inappropriate to use it. It's appropriate to use it when a party who against to summary judgment is attempted to be obtained. Well they do cite that Third Circuit case where they did it. There is a case out there that you could read differently your honor but if you read all the other cases those those cases. All right thank you. Do not run this way. I'm sorry. All right thank you. You'll have your rebuttal. Oh thank you your honor. May it please the court. Dan Downey on behalf of Captain Faye, Sergeant Mayor Richland County and Sheriff Sheldon. If I may your honors I may be able to clarify some of the discovery issues that you spoke about earlier with opposing counsel. I think if you note in Judge Nugent's second decision regarding the Monell issues he expressed some amazement at the decisions made as to to depose and noted I think that plaintiffs chose not to depose any of the officers who were essentially involved in Operation Turnaround in their capacities. They did do three 30 B6 depositions. I would note they never sought the deposition of Sheriff Sheldon on the Monell claims themselves and you know those were as a court noted strategic decisions but they also I think lay an underlying fact in this litigation. In the Robertson line of cases Judge Nugent permitted six depositions. I think there were two hours or three hours limited and I think one of the reasons or justifications for that was because those particular buys were not the focus of the Lee Lucas criminal trial or the investigation was conducted by the DOJ. There's extensive testimony from both Captain Faye and Sergeant Mayor regarding their involvement in in these specific buys. Sergeant Mayor had involvement in the Ballard buy. He testified about that. Sergeant Mayor had involvement with the Lucas trial. Correct and that full transcript is a part of the record here. I think there's a hundred and sixty pages of testimony from from Sergeant Mayor. I mean at that point they're testifying against Lucas. Well I think Sergeant Mayor was brought in by the government to testify. I don't know that he would argue that he was testifying for or against Mr. Lucas but simply telling what he knew and I think that that record is firmly established and and frankly the fact that plaintiffs did not seek their depositions when he was permitted to do so. I think what how do you say six depositions when there's also a Monell claim there and besides he was already out. Wasn't Mayor already out by the time that they were permitted to do this? Sergeant Mayor was dismissed but they were certainly permitted to call him in and testify as to the Monell issue. Sergeant Mayor was the detective sergeant under Captain Faye's detective bureau. They could have asked him questions about policies and procedures. The reality is all that was covered in the affidavits and in the extensive record created by the DOJ and their investigation and in the subsequent criminal trial. Realistically we know what they did and what they did not do in carrying out the investigation. There's an extensive record that you made phone calls, they followed Bray, they searched him, they searched his car, they went to and from the buys with him, they tried to maintain eye contact on him when they left. All that stuff is firmly established in the record. This argument that there's some discovery out there that they're unaware of to me is a false argument. It's not a matter of that they're unaware of. Look there's there's evidence that all of these people lied in different circumstances. I disagree with that. Okay well. I firmly disagree with that. I don't think there's any evidence that Matt Mayer's ever lied or that Captain Faye has ever lied or that Sheriff Sheldon has ever lied. Didn't Faye admit that he lied about following Davis? No. He did not admit that he lied about following Davis. I think the testimony from Captain Faye which just came out six months ago in the Webb and Price case because he was deposed, Captain Faye observed who he thought was Ron Davis at Glessner and he did not follow them to the buy and the reason is pretty clear. There were two other undercover officers who were present at that time who would not be made as being local law enforcement officers. But didn't he say he followed them? He wrote it in an affidavit which we believe that he copied from a DA6 report at the time that they were doing a warrant to go and arrest people. Did he say something that wasn't true? He wrote something down in the affidavit that wasn't accurate. I agree with that. He did not lie and he will deal with that at trial. Okay but that's those are questions for a jury but what I'm saying is that we don't have a situation where this is out of you know whole cloth where it's like all made up. We have something where we know that some things were happening. Not with respect to these two buys which I will get back to that. Captain Faye didn't work the day of the Lowe'sco Ballard buy. Matt Mayer wasn't working the day of the Geneva France buy. When you look at what the Sixth Circuit has done with these particular cases and what their extensive precedent holds you have to have an underlying constitutional violation involving these folks. We do not have that and as you listen for 10 minutes he did not share that with you. There is no underlying constitutional violation. Lee Lucas took over the investigation through the DEA in September of 2005. He handled the prosecutions. He made decisions with Blas Serrano. The record's clear that Blas relied upon Lucas not upon anybody from Richland County. There isn't a shred of evidence that Sheriff Sheldon had any involvement in these particular buys and I think through the course of the entire investigation he did a drive around somebody on one of the buys. That's the only thing he had to do with it and so when you look at the the extensive briefing and the extensive record that's been created in this case it's all about all these other buys that were that took place. It's not about the ones that we have here. How did they target these two people? You know I think part of the goal was and this is a longer answer your honor and I'm going to get to your specific answer. They were attempting to solve a murder as you know from all these other cases in the extensive record. They were trying to solve a murder. Tim Harris died in December of 2004. They believed it was drug-related. They started doing buys in Richland County to see if they could uncover information. Jarrell Bray had proven himself to be reliable prior to this investigation and frankly throughout up until the DEA involvement. They used Jarrell Bray to try and make buys not even thinking that they were going to necessarily prosecute these folks. They wanted information. The decision to prosecute folks prior to the involvement was ultimately made by Blas Serrano and I would note that under the OIG investigation they found that 15 of the 16 buys prior or individuals prior to DEA involvement were actually good buys. Roosevelt Williams who you hear about in the brief had two successful buys prior to DEA involvement. In October of 2005 the argument is that Roosevelt Williams wasn't involved. Roosevelt Williams pled guilty to the two buys involving the RCSO. So in a way they targeted people to try and uncover information regarding this murder. That's how targets were chosen. Geneva France was not a target of the investigation. Ron Davis was. He was believed to be a big drug dealer in Richland County. Turns out that he was. He was using assumed name. His name was actually Herman Price. But Geneva France was the person who Lee Lucas testified, did the hand-to-hand. Lee Lucas was in the car with her. He was sitting a foot and a half away from her. He identified her at trial. The prosecution was based upon his identification at trial. The only thing that Sergeant Mayer did with respect to that was try to uncover a photograph because they couldn't come up with one from the BMV. He actually did good detective work in trying to locate a photograph that ultimately Lee Lucas believed was her. So we talk about the investigation who targets people. Yes, Richland County made decisions about who was targeted in the investigation. But every other decision that was made was essentially made by Lee Lucas and Blas Serrano. And the record's clear on that. And with respect to this case, you have Jarrell Bray. You asked a question about the affidavit. I'll give you an example. In the Weapon Price case, there were prior statements made by Jarrell Bray. The court found that his trial testimony was actually subsequent to his initial statements, where he failed three polygraphs and said a number of things that weren't accurate. I think that the OIG investigation uncovered that initially Jarrell Bray said that Lee Lucas or Jamal Ansari were involved. Didn't Metcalf and Faith inaccurately state that they watched Davis during this, one of these buys that eventually, that sort of led to to France? And again, I went through it, but Sergeant, excuse me, Captain Faith was in a car with Sergeant Metcalf, okay? They saw who they believed to be Ron Davis at a corner driving. He could make a right turn. It was a right only. They kept going because they did not want to be made as law enforcement officers. They did not follow him. That's the testimony from Captain Faith. But they said they did. The record in carrying out the search warrant, the warrant to arrest Ron Davis that was created by Captain Faith, and there's extensive testimony in the record on this, he made a mistake in creating the affidavit. I mean, I used to see a lot of drug cases and get the warrants and, you know, hear the probable cause. And I have never seen anything like this. I mean, there's a way that you do a controlled buy. There's a way you handle a CI. And it's like nobody bothered. Well, again, Your Honor, I would disagree that nobody bothered. And I do think that if you're Richland County and you have the DEA and a federal task force coming into your county because you don't have the resources to really carry out this investigation, you have every reason to believe that they're going to do things appropriately. I would note to you that prior to DEA involvement, Jarell Bray would go back to the RCSO and there would be a debriefing. The DEA did not require that as part of their policies. Do you think it was to their attention that their procedures just were inadequate? I did not believe that their procedures were inadequate. Okay, who's Brown? Isn't there somebody who went to see them and said, you've got a problem in the way you're handling this person? Don Brown is a Richland County deputy who was assigned to Metridge. Metridge signed up Jarell Bray as well, signed him up earlier in the year in 2005. My understanding is they used him on a buy. I think that Jarell Bray and Don Brown did not have a great relationship. She had difficulty controlling him. There were discussions that were had back and forth regarding that. I'd note to you that a federal prosecutor was aware of many, many things regarding Jarell Bray, including the And he did not believe that Jarell Bray was providing false testimony following that trial, following all the proffers that are a part of this record, including the proffer of Roosevelt Williams and Enrico Spires. So the idea that Richland County should have known that Jarell Bray was somehow setting up innocent people, I think is flawed. And if you look at the Westerfield case, which is the only case involving anybody prior to DEA involvement, where it was determined that Jason Westerfield did not do the buy, he was wearing an ankle monitor, if you will. Matt Mayer wrote down in his report, check ankle monitor, okay? And that information was produced, the federal government got it, AUSA Serrano got it, that information was provided to Westerfield prior to the trial, and yet the U.S. Attorney assigned to the case did not determine, hey, there may be an issue with Jarell Bray regarding the ankle monitor. There was testimony regarding it. Let me ask you a different question. This business with the Declaration, I have never heard of the application of a sham affidavit in this context. I mean, how do you do that? You've got a defendant who's giving inconsistent statements and you say to the plaintiff you can't use it because they're inconsistent? I think it's perfectly appropriate to strike that affidavit, Your Honor, and I'll give you an example. There is not a shred of evidence following a 27-month federal investigation that Matt Mayer played any role in the Ron Davis Geneva France buy at the day of the buy. Not a shred of evidence in a 27-month investigation, in testimony at trial, nothing said to the OIG that he was involved in it, yet we have this affidavit that was provided literally after motions for summary judgment were filed, after discoveries took place, two weeks before Mr. Bray passed away, an affidavit saying that not only was Matt Mayer there, but there was a video and that the video showed that he couldn't have been Geneva France going in the car. It's absolutely ridiculous to suggest that that would be evidence that gatekeepers should permit to a jury to come to a determination as to whether or not Matt Mayer was involved in the buy. Wasn't the first statement that he said that the agents knew? I think the first statement that he said was that Lee Lucas and Jamal Ansari knew. I don't believe that he said that Richland County operatives knew. More importantly, unless he said in his OIG investigation, which he did not, that Matt Mayer and Larry Faith were involved involved in videotaping the Geneva France buy, that to me is a post-inconsistent statement following his testimony trial. And I would note the Sixth Circuit has recognized Special Agent Thomas's report regarding this investigation and has used it in evidence to determine whether or not there's a question of fact regarding Lee Lucas. To me, if that's the case, it would be wise for this court to recognize that this 27-month federal investigation uncovered no such wrongdoing and was satisfied that Terrell Bray had testified truthfully at the Correct. The federal government believes at the criminal trial that they had gotten Terrell Bray, that they had checked all the things that he had said, they had gone back to him, they met with him five times, they polygraphed him three times. They believe they got to the truth, Your Honor, with respect to that investigation. To me, it would be utterly ridiculous to suggest that Terrell Bray from the grave can testify against Matt Mayer on a buy he did not attend based upon the sham affidavit. I'm sorry, the business about testifying from the grave has nothing to do with this. We're talking about whether the court properly struck the the declaration. It has nothing to do with testifying from the grave. He was alive at that point and... Not the point of the decision, Your Honor. He passed away two weeks after the affidavit was was filed. I attempted to meet with Mr. Bray at a point during the course of this case. He would not meet with me. He is a party to this lawsuit. He did, in my view, execute a self-serving affidavit. I do not wish to get into his head to determine why he chose to lie in the manner that he did at the end of his life, but realistically, there are gatekeeping mechanisms in place to prevent this sort of polluted testimony from affecting other folks in the context of a trial. As counsel, I think the fact that Mr. Bray is no longer with us is a significant factor. I can't to cross-examine him or talk to him about these issues. I didn't realize, excuse me, when the judge ruled he was already dead? Jarrell Bray, I believe, died, and they may know better than me. He died two weeks after, I believe, this affidavit was filed with the court or somewhere in that that range. Okay. Anything else? Nope. All right. Thank you. Good morning, Your Honors. Michael Heimlich on behalf of Detective Metcalf. To address the question that you just asked Judge White, the unreliability of Jarrell Bray's affidavit is a matter which I think needs to be evaluated in sort of a multi-layer way. The real question isn't, is it a sham or not a sham affidavit, but does it have evidentiary value? When you look at the context and the content of the affidavit, the first thing you find is that a lot of what is in there is summary, conclusory type statements which have no basis in personal observation. And as we all know, in order to support or oppose a motion for summary judgment, you have to submit affidavits that have evidentiary value and would have content that is admissible at trial. So in acting as the gatekeeper in determining whether or not the affidavit is an acceptable affidavit, what the court should look to, first of all, is the timing of the affidavit. Is it after the sworn statements that were subject to cross-examination? And as I have stated in my brief, what we in the legal jargon have typically talked about is indicia of reliability. This particular affidavit lacks those indicia of reliability, and this court has determined in a criminal setting that there is an inherent unreliability where one defendant attacks another. And that's cited, Lilly v. Virginia is cited in my brief as the context for that. But what we're looking at here is essentially Jarrell Bray, who is unreliable in a hundred different ways as a witness, and Bray submitting this affidavit at the request of the plaintiff in a self-serving way for the specific purpose of creating a material issue of fact. And it's not a genuine material issue of fact, and for that reason the trial court was proper in deciding that this has no evidentiary value, can be excluded as a sham affidavit, and should not be considered. Okay, you can do that after a trial when someone is bringing forth recanting evidence, or sometimes in a dram shop after somebody's settled, but we don't usually exclude evidence prospectively. So if a defendant gives testimony and then later gives conflicting testimony, the plaintiff doesn't say, you know, to the judge, oh, don't let them give the second version because they already gave a different version. I mean, it's impeachment. And as your Honor, as Mr. Downey pointed out, your Honor, that might be an approach to take if Mr. Bray was still alive at the time of decision and was available to testify at trial and be cross-examined on the content of this affidavit. But under these circumstances, in this case, the decision to exclude an affidavit that had no evidentiary value based upon the content of the entire case, the judge made the right decision. Okay, but the issue, and I think we need to, and I'm not saying they're not related, but I think we need to separate what would be admissible at trial from what is a permissible consideration on a summary judgment motion. And again, your Honor, I think when you look at the rules of civil procedure, they require that those matters in support or in opposition to a motion for summary judgment must be the types of things that would be admissible at trial. In other words, based upon personal observations. A lot of what Mr. Bray says is conclusory, speculative. The content of the affidavit itself is of little value. For that reason, again, your Honor, if we look at what value the affidavit or the declaration has in this context, it's virtually zero. And the plaintiff never asked to depose your client? That's correct. And the reason for that, your Honor, is known only to them. Is what? Is known only to them. Detective Metcalf is in the area. He's a resident of Richland County. He stayed and attended some of the other depositions that were taken. When the limitations on the depositions were imposed in this case, apparently this sixth deposition rule, was there an in-person meeting with either the judge or the magistrate judge in connection with that requirement? Your Honor, I don't recall that specific limitation. So I don't know that I'm in the best position to speak to that. You couldn't speak to the question then whether at that point somebody said, look, six isn't enough because we've got to do three for the 30B6 and we need eight or nine or whatever it is? Your Honor, as you stated in your dialogue with opposing counsel, the arguments that were made, the types of position that were taken, I think you described them as sweeping, generalized statements. The trial court was dealing with the same thing. There was this constant attempt to bring in matters that were not relevant to these particular cases to provide some sort of discovery and a sweeping conspiracy theory that would allow the basically unbridled discovery was what they were seeking. And as we all know and qualify. Was there a discussion about a particularized need for more than six? And I think you're saying you don't know. What I'm saying, Your Honor, is that there was a discussion about discovery in general terms. There was no specific acquiescence to any limitation. The plaintiff's counsel in the case was seeking unbridled discovery and the court, because we were in a qualified immunity situation, said that will not be accepted. But your client didn't get qualified immunity, right? Correct. He did for certain portions of the case, but not with respect to everything. Yes, I mean, why should we look at this in a vacuum? I understand that you have to look at the particular conduct of the particular defendant with respect to the particular claim. But there's also surrounding evidence. Are you saying that your client was not complicit in any of this, even with respect to other buys or other people? I mean, I don't think you're saying that, are you? What I'm saying, Your Honor, is this. Detective Metcalf pled guilty to the violation of the rights of Duane Nabors. Can you speak up? Yes. He pled guilty as to a violation of the civil rights of Duane Nabors in indicating that he testified untruthfully at Mr. Nabors' trial. And if you look at the testimony from the Lucas criminal trial, what he said was he was in unfamiliar surroundings, not accustomed to testifying in federal court, and that he regurgitated what had been written in the DEA-6 report. Beyond that, Your Honor, what I would contend is that Detective Metcalf and others at Richland County were looking for additional assistance and resources from the federal government. When the DEA came down, operational control was turned over to Agent Lucas, and Detective Metcalf became sort of a secondary player. And so he didn't do report writing. He didn't do those kinds of things. If you look in this case in particular, he offered no in-court identification of either of these people. And so I would say he was not the bad actor, perhaps, that he's trying to be portrayed as. Well, he doesn't have to be the leader, but, I mean, how do you... Okay, there are phone calls being made supposedly to a particular person. And part of an investigation is, like, you know that you identify the target's phone number, and then you see them dialing it. I mean... In this case, Your Honor, Detective Metcalf has testified that the people involved in this particular drug circle were frequently using throwaway phones. They were what they called burn phones. They would buy them at a convenience store, use them for a while, throw them away. And that many of the numbers were, like, on Jarrell Bray's speed dial. He would, you know, he would dial it, and it would have somebody's name. And so I think that we have to distinguish between what might be considered negligent investigation versus constitutional violations. Or you identify the target's car, and, you know, you hear, okay, we found there was this car with this license plate. It was registered to this person. Or we did surveillance at a house, and the house is titled in this person's name. Or, you know, there's something that connects the person in the drug deal to a particular person. There's some piece of information that's completely absent. In this case, Your Honor, again, as Mr. Downey indicated, they were trying to solve a murder. And a lot of the connection to these people was simply the targets was simply their connection to one another and their connection to Jarrell Bray. Am I right that as to these two plaintiffs, Lucas testified that he observed hand-to-hand transactions? That's correct, Your Honor. He was in the car at the time that he conducted the buy with Geneva, France. And he was in an adjacent parking lot, I believe, next to Eastgate Apartments. Did you say he was in the car at the time he conducted the buy with Geneva, France? Yes. As I understand that transaction, Your Honor, Agent Lucas and Geneva, France were in the same car with Jarrell Bray. So you're saying Geneva, France sold him drugs? Agent Lucas has testified that Geneva, France sold him drugs. Okay. That's not what you just said. You said he was in the car with Geneva, Lucas when she sold him drugs. That's what you said. That is his testimony, Your Honor. But we know that's not true. I don't know that there's agreement on that point, Your Honor. I believe that Agent Lucas, if he were to testify today, would still say Geneva, France was the person in that car. All right. Well, maybe you shouldn't say it. I'm simply, again, Your Honor, saying that there was a hand-to-hand transaction and Agent Lucas was the person who observed it. Okay. Maybe you shouldn't say what you just said. Maybe you should leave her name out of it under the circumstances. I'm done. All right. Thank you, Your Honor. Thank you, Counsel. Mr. Koenig. Thank you, Your Honor. These were crimes that never occurred. These people were not involved in the crimes because the crimes never occurred. Well, we don't know whether the crimes occurred, but these people didn't do it. The crimes never occurred because the people that were involved in doing the sales and doing the deliveries were people that were employed by Bray and Lucas to bring the drugs, to drop the drugs off. They were hired by the people who worked for the county or worked for the DEA, and therefore, they were all part. This was a staged transaction. There wasn't really a drug transaction that took place either in Ballard's case or in Geneva France's case, and yet they want to say that Geneva France was the person who dropped the drugs off or that Ballard is the person who sold the drugs. There was no transactions. This is like framing somebody for a murder. We're not talking about there being a body there. We're putting the gun in the wrong person's hands. There is no body. The murder never occurred. We've got that person in hiding, and we're framing this person anyway for the murder. The point is what is the evidence that Metcalf and Mayer and Faith knew that? Right. Your Honor, in the case of the Ballard drug buy, Metcalf and Faith were there surveilling the transaction. I'm sorry. Metcalf and Mayer were there surveilling. I'm sorry. Metcalf monitored the phones in the Ballard transaction. Mayer surveyed and did the video of the transaction. Metcalf was in control of the phone calls and was supposed to monitor them and was supposed to look them up, and he knows that the phone calls that went into the report was a different phone number than what Ballard actually called. He knows that he put in the— No, Your Honor. By the time—should have known could be back in February or March. By the time you're in September and October, they knew. They had just two days earlier— What? They knew that there was a fabrication in line and stand-ins being used by Bray and Lucas. Just two days earlier, with respect to the transaction that Noel Mott was supposedly driving up to Detroit to buy $36,000 worth of cocaine, what Bray did not know was that the officers intended to pull that car over and seize the $36,000. He had stand-ins show up for that transfer. Can I follow up with that? You're saying they knew by that time that he was using stand-ins. Right. And please tell us exactly what the evidence was that they knew that. They were using—well, again, Your Honor, in the Mott case, Noel Mott case, just two days earlier, when the police pulled that car over and expected to find Mott and Spears in that car driving to New York, they found two stand-ins, Transall and Crystal Dillard. And when they found that this was nothing that Bray had told them was going to take place, they prepared a report that said that, in fact, it was Transall and Dillard that were supposed to be in the car. And who prepared this report? And that all reports were prepared with the assistance of Metcalfe, Mayer, and Faith. Lucas has testified to the fact that all of them participated in preparing reports. All reports did not get prepared by one person. All reports and all these transactions were a collective effort of all of the parties. But were all the reports false, or did all the reports show that Bray was messing around? We did not answer whether all of them were a report. In our brief, we've set forth a number of reports that were false. And, in fact, the Ballard report was false. It contained a false phone number that was Ballard's phone number and was not the phone number that was called. Mayer is operating the video. Mayer sees this person arrive who looks nothing like Ballard. By the way, Ballard is known to Mayer. Lesko Ballard's mother works for the police department in Mansfield. And the police and law enforcement personnel out there know the Ballard family. And the person who arrives to do the sale in the Ballard transaction looks nothing and not even closely resembles him. Mayer is videotaping this. Let me interrupt you for a second and just illustrate very briefly what the problem is in following this. You say his mother worked for this police department, a different police department. So, therefore, everybody must know him. It doesn't establish that are we talking about Mayer here? We're talking about Mayer operating the video. So, is there evidence that Mayer knew him? Your Honor, we didn't get to take Mayer's deposition. The answer is no. The answer is that Mayer's family knew Ballard's family. Lesko has testified to that. Every time I ask you a specific question, you answer it in the broadest possible terms. Your Honor, I'm sorry. I don't know. The question is, what is the evidence that Mayer himself knew what this guy looked like? We were not permitted to take discovery. We don't know what Mayer knew, Your Honor. I don't mean to be... So, the answer is there isn't evidence, but it's because you didn't get to take discovery. There's circumstantial evidence, Your Honor. Okay. Thank you. Going back to Geneva's case also, I want to point out that not only was Metcalf and Faith involved in the surveillance of that, but subsequent to that, in order to identify Geneva, they did a photo array. And Mayer is the one who put together a one photo array with Geneva France's name labeled on the photograph of her picture from sixth grade and gave that to Lucas and Bray to ask them to identify, is this the person? Now, at the time of the supposed drug buy, Geneva had dyed her hair blonde and had been a blonde for a while. A blonde black woman looked nothing like the person that said that she was Little S. The second thing is that there was a supposed phone conversation that took place... Excuse me. Are you answering the question? No, I'm not. I'm talking about... Your red light's been on for a bit, so... It is. I'm so sorry, Your Honor. You get to finish whatever the question was. Yes, I was done with the question, Your Honor. I'm sorry. What was the phone conversation? All right. Thank you, Your Honor. All right. Thank you. It's a confusing case, needless to say. We'll go back and try to sort this out, and we'll give it due consideration. Case will be submitted. Thank you. Please call the next case.